Thank you, your honors, and may it please the court and counsel, I'm Michael Rotker for the United States of America, the appellant in number 03-10439. Could you move over a little bit and speak directly into the microphone? Yes, certainly, your honor. Your honors, the government's appeal presents a straightforward question of statutory construction concerning the Gun Control Act of 1968. The specific question presented is whether a federal firearms licensee is acting in a licensed capacity when he sells firearms at an out-of-state gun show. The district court concluded that such sales were authorized, but that conclusion rests on a flawed understanding of congressional intent. Accordingly, the judgment on count two should be reversed. Well, you don't necessarily get to intent if the statute on its face is clear. Well, that's right. Our position is that Congress's intent is clear on its face, that the text of the statute What I mean by Congress's intent is that the plain meaning, the plain language of the statute clearly evidences Congress's intent to establish a location-specific licensing regime. And what I mean by that is to say that a licensee is authorized by the terms of the license to conduct his operations at a specific location, at a specific business premises. In this case, Mr. Ogles was licensed in California. Well, Mr. Arger, I read the statute as whole, that is, 922, 23, and 24, as saying pretty much that. I mean, it seems to me pretty clear from reading the entire package that that's what was going on, and that the regs sort of say the same thing, and so do the ATF guidelines. However, this prosecution was under 922A1. Correct. And unless I'm misreading the structure of 922, A1 applies to ordinary mortals, whereas the remaining part of 922, a separate section, applies to licensed dealers. So why isn't it plain on the face of 922A1 that it applies to nonlicensed dealers? It does apply to nonlicensed dealers, but I think the fundamental question presented is what does it mean to be a licensed dealer. And the government's position is that with respect to 922A1a, when a licensee sells away from his premises, he is essentially acting ultra-virus. But would this be true if Ogles, for example, sold guns in San Francisco? It depends, Your Honor. If it was at a gun show. He just up and sold guns in San Francisco. Yes, Your Honor. It would be. So you would consider him a nonlicensed dealer in that respect? For purposes of those transactions, that's correct. His license authorizes him to conduct operations at his business premises in, I believe it was Duarte, California.  Now, 923J is a specific provision that also allows him to sell at a gun show located in the same state in which his premises are located. So he could sell at a gun show in San Francisco. But other than that, any sales that he engages in of firearms are considered ultra-virus. They are beyond the scope and the terms of his license if, as Your Honor has suggested, you agree with our reading that Congress intended that the statute is plain in terms of evidencing. Well, I don't think 922A1 is plain at all. What I'm saying is that the statute read as a whole seems to communicate that a dealer is supposed to sell from the location that he applies for or pays a fee for or at a gun show within the state. Correct. And what the ---- But my problem is that A1, which is what he's prosecuted under, doesn't do that. Well, I think it does, Your Honor, with all due respect. Why? We think it says anyone except a licensed dealer. Okay. So again, we come back to the fundamental question. Was Mr. Ogle's acting with regard to the sale at the Arizona gun show, was he acting as a licensed dealer? And our position is absolutely not. He exceeded the scope of his license. He was ultra-virus as to those transactions. And therefore, he was subject to prosecution because, if you will, the statutory exception for licensed dealer doesn't apply to him, and therefore he was, I believe Your Honor's term was an ordinary mortal. He was just selling as though I were selling, someone who doesn't have a license. He was in the same position with respect to those particular disputed transactions. Now, we acknowledge, as we did in our brief, Your Honors, that the Sixth Circuit in the Caldwell case, which the district court relied upon and which the defendant has now embraced, that they rejected the government's position. We acknowledge that. However, we have long maintained and we continue to maintain that Caldwell was wrongly decided, that the case fundamentally misinterprets the intent of the legislature, that the plain meaning of the statute makes this location-specific licensing regime very clear. The only problem I have with your argument is that we're dealing with a five-year penal statute. Yes. And you are essentially making a fairly technical regulatory violation which has very serious consequences. Why wouldn't the normal rules of statutory construction apply so that the defendant gets the benefit of the rule of lenity? It's a good question, Your Honor. Our position is that, as I'm sure the Court knows, canons like the rule of lenity, rules of strict construction, are default rules that come at the end of the interpretive process. And as what we do is we start with the language of the statute and we determine Which talks about a licensed dealer. There's no dispute that, at least as to his business premises in California, Mr. Ogles is and was a licensed dealer. Absolutely. We concede to that. And under the regulations, he can go to a gun show in Arizona and offer weapons for sale. Correct. He cannot, under the regulations, part with the weapons at that location. He's got to go back to his licensed premises. Correct. Ship them to an Arizona FFL who then makes the delivery. Sort of classic regulatory enforcement. But you want to put him in prison for 5 years on the argument that because he violated the regulations, he was not acting as a licensed Federal firearms licensee. And I have a problem with that because of the hammer that you're using. I appreciate the Court's concerns. Let me say, we do think it was a regulatory violation. But I also believe that it's a statutory violation. It's not just, as Your Honor said, I mean, it is a technical regulatory violation. But it's also a violation of the plain language of the statute. The statute applies to anybody except a licensed dealer. And, again, I don't mean to sound redundant. Can you cite me any case other than that old, was it Dotterwich, that old Supreme Court case involving the Food and Drug Act? Right. Where a court has upheld this kind of a severe penal sanction for a regulatory violation? Of course, I guess in Dotterwich, you could distinguish it on the grounds that it was a strict liability offense. I believe that's right. Whereas here, the government, I think, arguably presented sufficient evidence to show knowledge. Wilfelman. Yeah. So I think that that's right, Your Honor. Again, just for purposes of setting the record clear, I don't concede the point that this is strictly a regulatory violation. It is and has been our position that this is a statutory violation. And because, as Your Honor just pointed out, because there was a knowledge of scienter requirement, and not just ordinary knowledge, we're talking about a willful act, we believe that it is sufficient to impose criminal liability. Had Mr. Ogles been a citizen who simply showed up at the Arizona gun show and offered to sell a weapon to someone else, would that violate the same provision of the statute? I believe so, Your Honor, yes, because anybody except a licensed dealer. Only somebody, an Arizona licensed dealer. It has to be, yes. Because you're saying he's not a licensed thief. Correct. He's in the same position. That's correct. All right. I would be happy to address any other questions, including the jurisdictional issue, but I would like to reserve a couple of minutes for rebuttal, if that's okay. Okay. Surely. Surely. Okay. Mr. Gardner. I'd like to just quickly, if I might, address the judge's question over here about what statute. In fact, there is another statute. It would be 922A3, I believe it is, which deals with transfers of firearms between residents of nine. It's the same statute. It's just a different subsection. It's a different subsection. Well, all the penal provisions of the Gun Control Act are in section 922. No, a 922 violation for which you can get five years. That's correct. But it's a different. Congress specifically created a provision of law which prohibits the transfer of firearms from residents of one State to another State. And then in section 922B is where the provisions are dealing with dealers, licensed dealers transferring firearms to residents of another State. So the government's argument that this is covered by 922A1 really is contrary to what Congress did. I mean, Congress created three separate provisions here. One is 922A1, which is engaging in the business of dealing in firearms without a license. Then there's 922A, I think it's A3, it might be A4, which is sales by any person other than a licensed dealer. That's A3. Okay. And that would be the out-of-State dealer or the nonresident transfer provision. And then 922B3, which is the provision dealing with dealers selling to nonresidents. That's, again, yet another section. And, indeed, Mr. Ogles was convicted of violating that section in the other appeal. That's the Count I offense. That's the Count I offense, exactly. But I'd like to start out by pointing out that the government skipped over what I think is really the more significant issue in this case, and that is this was an acquittal in the court below. The district court judge ruled on Rule 29 and acquitted Mr. Ogles. And she did that by looking at the facts the government had presented, and the discussion about whether she correctly interpreted the law is really not, should not be, in our view, an issue. Facts really weren't indisputed. I mean, this was clearly, to me, a case where the district court said, look, I think Caldwell got the statutory interpretation issue right. That's the end of this. That's right. But the first thing the district court judge did is looked at the facts as presented by the government and made a factual determination. Well, that was clear on the face of the indictment. No. No, it was not on the face of the indictment. Sure it was. The indictment alleged that he was a licensee who sold outside of the State. We're talking about Count II. I understand. That's exactly what Count II said, isn't it? And the elements of that offense under the statute, they have to prove that he was not a licensed dealer. And that's the key element. Yes. And the indictment said a licensee who was selling outside of the State in which his business was located. So you could have made a motion to dismiss that indictment under Caldwell. Well, I'm not sure we could have, because the ultimately the statute doesn't the statutory elements are somewhat different. I mean, we could have made a motion to dismiss, I suppose, and the government would have simply reindicted him under the correct elements of the statute. Well, that's the government's theory. I mean, Count II accurately reflects the government's theory. And your theory is, well, no, A2 doesn't reach this conduct. And in fact, what the government did is that they submitted jury instructions which were consistent with what the statute requires, which were not consistent with what the indictment required, with what the indictment stated. They apparently finally realized that the indictment was not exactly correctly phrased and submitted jury instructions with setting forth the proper elements, and it was as to those elements that the argument was made. So are you arguing a variance now? Because I don't remember seeing that argument in your brief. The what? A variance. Is that what you're arguing, that you were prejudiced by the variance? No. No. I mean, we knew they submitted their jury instructions before the trial, so we knew what the elements were going to have to be. But that doesn't cure the – if there is a variance problem, that doesn't cure the problem, does it? That exacerbates it. It probably doesn't, but I would – I guess we probably waived that issue by not raising it. I think we have. But once we got to the Rule 29 motion, everybody was – both parties and the Court focused on the language of the jury instruction, which was the proper – which set out the proper elements of the offense. And that's what the judge focused on in deciding the Rule 29 motion was the undisputed as to what the elements of the offense were. And the judge found, as I said – or concluded that the evidence showed, because the government produced the – Mr. Ogles' license, that he was a licensed dealer. So the district court, in fact, made a factual – looked at the facts and applied those facts and then, yes, made some legal interpretation following that. It is concluded that having – the evidence having shown that Mr. Ogles was a licensed dealer, then we look at the statute and rule on the law. Now, if the district court was wrong on the law, and I – although I think the district court was right, but if the district court was wrong in interpreting the law to reach its acquittal, that's not something under the Sanabria case and the other Supreme Court cases that this Court can look at. The question is, was there an acquittal? And if there was, even if the Court was egregiously in error, as the Supreme Court said, with regard to its legal interpretation, the acquittal still has to stand. And we would argue that that's the case. Kennedy. Doesn't it depend on the grounds of the acquittal? If the acquittal was a misreading of the statute, the government has a right. No, Your Honor. That's – in fact, that's exactly what the Supreme Court has said is not correct, that even if the – even if the Court misconstrued the statute and the acquittal is an acquittal, if the judge made a factual – looked at the facts and said – But the facts are not in dispute here. The question is whether a licensed dealer means licensed in the State of Arizona or selling to a resident of California. That's a legal – that's a legal interpretation of the legal standard. I'm not sure you're stating this. I thought the Supreme Court standard was whether or not the judge's ruling went to the question of guilt or innocence. In other words, whether the finder of fact had the opportunity to make the determination. That's right. Whereas if the Court simply makes an erroneous ruling and grants a motion for judgment of acquittal because she misunderstood the law, there's no double jeopardy problem if we reverse the trial court's determination and remand it. Your Honor, with all due respect, I don't think that's what the Supreme Court said. I think they made clear that even if the trial judge makes an erroneous interpretation of the law, as long as what they've done first is look at the facts and say that no reasonable jury – I'm not looking at the facts. I mean, the problem is you have to make a sufficiency of the evidence determination. Right. You have to say, look, on these facts resolved in the government's favor, the defendant still – That's right. The government can't possibly win, right? That's right. That's correct. And here the district judge did not speak in those terms at all. She didn't. Well, she said – she used the word finding, which was essentially – Well, I know. And she doesn't make findings. Right. She – except to the extent you find that the facts are insufficient, she never made a sufficiency determination. That's right. Well, she made the finding, if you will, that the facts were insufficient in the sense that the government hadn't proven that he wasn't a licensed dealer. What is your best case? Because that was one – that was one of the facts. The government would have proved that had the statute not been construed in accordance with Caldwell. Well, that's – that may be right, but the point is that the district court judge looked at that fact, that they didn't prove that he wasn't a licensed dealer, because this Rule 29 motion was made at the end. Now, I think you're confusing the role of the court and the jury. In this case, in a jury trial, the court terminated the proceedings without giving the jury the opportunity to decide guilt or innocence. That's true. And she did so on the basis of her interpretation of the statute. I don't see how this is not controlled by the Supreme Court's decision in the United States v. Scott. Well, I think it is controlled by that, but I would have reached a different  The opposite conclusion. Yes. Because the trial judge did look at the evidence, and she said that if this went to a jury, no reasonable jury could find him guilty because the government's evidence, looking at the light – the evidence in the light most favorable to the government, i.e., their evidence that he was a licensed dealer, no reasonable jury could find him guilty based on that fact. But there was no evidence whatsoever that he was licensed in Arizona or that Mr. Buda was a California citizen. True. That is certainly true. Well. And what we're really talking about now, Your Honor, is whether the district court misinterpreted the statute in looking at that fact as to Mr. Ogle's licensed status and then reached the wrong conclusion. And that's really what the – There was no factual dispute as to – Well, that's – but we were – there never is going to be a factual dispute when you make a Rule 29 motion at the government's case. That's right. But your argument, taken to its logical conclusion, is that every time the Court grants a Rule 29 motion, double jeopardy applies. And that's not what the Supreme Court says in Scott. Well, I think if there – if the Court has looked at the facts and said that no reasonable jury could reach the – could find this person guilty based on the evidence that was then in front of the Court, that would be right. In the time remaining, do you think you could take a stab at why the statute should not be read clearly to say you're licensed for a particular location or where you pay a fee or for a gun show in State? Well, those – those are all provisions which – which I think are – relate to the civil side. They're not in 922, as Judge Talman pointed out. They're in – they're in 923. But you're not a licensed dealer unless you specify the location, unless you pay a fee for a different location, or unless you're at a gun show in State. Well, that's – that is a construction of the statute. Yeah, well, why is it a wrong one? Because I think that we're talking – this, as Judge Talman pointed out, this is a penal statute, and the language of 922a1, which is the statute under which he was prosecuted, simply says if you're not a licensed dealer, you can't be a licensed dealer. But the point is to determine whether you're a licensed dealer, you have to look to the other sections of the statute. Well, I don't think that's necessary. I'm not sure that's the case, because the statute defines licensed dealer as someone who has a license. As provided in 923. No, it doesn't. Yes, it does. Okay. It says you have to be – you have to have a license as provided in 923. Yes. But 923 simply sets out in one of the – subsection D, I believe it is, the requirements for getting a license. Yes. And none of those provisions, those other provisions that the government has talked about, are in the provision which establishes the requirements for obtaining a license. So if you meet those requirements, that is, you have to have a premises. Right. And you have to not have prior – you know, have willful violations before that, you get a license. And he had a license. And, indeed, at the district court, the trial judge asked the government, isn't it true, you know, he is a licensed dealer? And the government said, correct. Well, you have a license to practice law in the State of California, presumably, but that doesn't mean that you can practice law in Arizona. That's right. And so you could be convicted of practicing law without a license. Even though you're licensed. Well, and that very issue, in fact, came up at the trial court. And the – as the trial court pointed out, this is a Federal license. It authorizes you to – it authorizes you to be licensed under Federal law. But it's not – it doesn't authorize you to sell guns all over the United States by mail. But there's nothing in the – in the specific language of the statute which speaks to that you have to be licensed in a particular State. It just says that you have to have premises, but it doesn't say – it doesn't – the statute. But it ignores all of the other restrictions on the license, which require the transactions essentially to take place at a fixed location. Or if that location moves, it must be within the same State in which the licensee has his business premises. Well, that – well, those provisions are in there, but what I'm saying is that those are not things that you have to – that are required before you get a license. Once you're a licensed dealer, you have a license. But it doesn't – it doesn't – I hate to use a pun, but it doesn't give you license to sell guns everywhere. No, it doesn't. But the – but the question, though, is whether this – because this is a criminal statute, whether that – those – as the Caldwell case said, whether looking at all those implications from other regulatory provisions affects the 922a1. And I would argue that even if you go through all the interpretation of the statute by looking at those provisions, in fact, when you do all that, you may end up with an ambiguous view of the statute, which means that the rule of lenity would apply in this case. Okay. Thank you, Mr. Gardner. Thank you. Mr. Rocker. I'll give you a little extra time since we used up a lot of extra time. Mr. Gardner. Hopefully I won't take that much time. The one point that I'd like to make, Your Honor, is on the question of appealability. Sanabria v. United States and Scott v. United States are two cases that were decided on the same day. This case is controlled by Scott and not Sanabria, and let me explain why. In Sanabria, the district court entered a true acquittal. It determined that the evidence was insufficient in the classic sense. The government failed to prove its case. What the government's position was, was that, wait a second, this acquittal should not be afforded the traditional finality that would give an acquittal because it was influenced by an erroneous view of the law. And the Supreme Court said it doesn't matter. Where the district court enters a genuine acquittal under the Martin Lennon standard, that acquittal is preclusive and that's the end of the matter. The government can't relitigate erroneous legal rulings. That case doesn't apply here. This case is governed by Scott. And the difference is that Scott says that where the ruling, and let me quote directly from the case. It's 437 U.S. at pages 98 to 99. In a case such as this, the defendant, by deliberately choosing to seek termination of the proceedings against him on a basis unrelated to factual guilt or innocence of the offense of which he is accused, suffers no injury under the double jeopardy clause if the government is permitted to appeal. And that's the difference. The ruling in Scott, as in this case here, is a pure question of law unrelated to factual guilt or innocence. And what the implication of Scott is and what Scott actually holds is that where there's an erroneous ruling of law that leads to that dismissal on grounds other than an acquittal, the government may appeal. And that's why we believe that this case is properly appealable. I would also just cite the Court as well. Judge Easterbrook has a thoughtful opinion in the Young decision, which is cited in our brief, where he makes the very same point. And I believe this Court's decision in Affinito is also a relevant precedent. Their mail fraud charges were dismissed in the wake of the McNally decision. And the district court entered a judgment of acquittal, and this Court said, no, that was not a true acquittal. It was a legal interpretation of the statute. So for all those reasons, we believe that the issue is appealable and that on the merits, the Court should reverse the judgment and remand the case. And if the Court has no further questions, I will be seated for the present. Thank you. Thank you, counsel. Your – we appreciate the argument. And – I was returning to the other case now. Oh, that's right. We're – aren't we? Correct. Wait a second. Oh, we did split this one. Yeah, we did. Sorry, counsel. We've got so many cases here we're trying to keep track of. Which one we granted special orders in? That's right. This was one of them. This is the – Mr. Ogle's appeal in case number 03-10069. And as we discussed earlier, Mr. Ogle was convicted by the jury of a single count of selling a firearm to a nonresident in violation of section 922B3, which is the statutory provision that I mentioned earlier, which affects – applies to dealers selling to nonresidents. And one of the elements of the offense is willfulness. That is, under the Supreme Court's decision that the government has to prove that the defendant had an intent to do something that the law forbids. And the evidence that the government put on in this case to show that was the testimony of a David Morse and Walter Pachowski to show that Mr. Ogle knew that it was unlawful to sell to a nonresident. But the testimony of both Mr. Morse and Mr. Pachowski was that only that they told Mr. Ogle that to affect the transfer of a firearm to a nonresident, they had to take the – he had to take the gun back to his place in California and ship it to the dealer in Arizona. And, of course, that information is directly contrary to this Court's holding in the Douglas case, where the Court said that the law is that the transfers can be made at the show as long as it's made through a licensed dealer from that State. So they were partly right and partly wrong. Excuse me? They were partly right and partly wrong, you would say. Well, I'm saying that both Mr. Morse and Mr. Pachowski were completely wrong. Not completely wrong. It still had to be made through a licensed dealer in Arizona, even though the guns were left there. Right. So they were 50 percent wrong. Well, they didn't testify to the latter point. They didn't mention that at all. All they testified to was that to affect the sale, he had to go back to California. And send the guns to Arizona and sell them through an Arizona dealer. Transfer them through an Arizona dealer. So at least they told him one element of the law which he was consciously violating to wit, selling through an Arizona dealer. True? Well, not sort of. Sort of. And the reason is because they told him this. Sort of. Sufficiently sort of for reasonable trifecta to so fine. No. Well, I don't think so, because they told him that he had to go back to California and ship it to a dealer in Arizona. They were wrong about that. Yes. But they were right about him having to sell through an Arizona dealer. Right? That, there's no question about it. That's right. And they gave him two pieces of advice, one wrong and one right. And he violated both of them. Well, I would argue that the two pieces of advice were linked together, that Mr. Morse and Mr. Pachowski didn't distinguish them and say, okay, you could also just transfer the gun to a resident of Arizona, I mean, to a dealer in Arizona, who could then make the transfer to the individual in Arizona. The information that they gave him was at best misleading and I think, in fact, erroneous. And therefore, the fact that the government can't rely on that information, that to show that Mr. Ogles acted willfully, I think it requires more than that. There had to be testimony that showed that he knew that it was a violation to make the transfer at the show without going through a licensed dealer. And that their testimony simply didn't address that specific issue. Well, I mean, they did tell him that he would have to ship the guns to them and that they would then deliver the firearm. Why isn't that enough? Because they were telling him that he had to go back to California to do that, which is not what the law requires, and they misled him from the beginning. But your position is that he could have handed it to the Arizona dealer at the gun show who then could have turned around and given it to the customer? That's what the Douglas case says. And that is correct. Douglas says, and I'm looking at, I guess it's page 1049 of 974F2nd. It says that so long as the transfer of the firearm is through a Nevada licensee who fills out the appropriate forms. But it doesn't really go quite as far as you want us to read it, which suggests that it then means that he could hand it to him on the spot. Well, to remove any doubt about that, the agent, the ATF inspector who the government called was one of their witnesses, testified that, in fact, that's exactly what could happen, that the dealer, that Mr. Ogles could have just handed it to an Arizona licensed dealer and the transfer could have been made at the show through the Arizona dealer. Is it your position that our footnote 3 in the Douglas opinion acknowledged but rejected the government's argument? Is that how you read that footnote? I think that's correct. Okay. But as I said, there was no to remove any doubt, the ATF inspector testified when she was called as an expert on the law that that's what could be done. So I think it's clear that the testimony that Mr. Pachowski and Mr. Morris gave, being directly contrary to what the law was, is not something that could be looked to to determine if Mr. Ogles acted willfully. And for that reason, I think there should have been the Rule 29 motion should have been granted as to that count as well. In addition, we had a motion for a new trial. And one of the elements of that was the impeachment of one of the government witnesses, Mr. Braxton. The government didn't disclose before trial or indeed until after the case had been submitted to the jury, we found out that Mr. Braxton was seeking employment with ATF. And interestingly, in the government's closing argument, they expressly argued to the jury that Mr. Braxton had no motive to come in here and try to fabricate that he saw these firearms purchases.  And the jury concluded that Mr. Braxton had no motive. He was trying to get a job with a very prosecuting agency that was prosecuting Mr. Ogles. And the trial court here concluded that it would not have made the testimony, the disclosure of that information, would not have made a difference to the jury's verdict. And I think that's the wrong standard under Kiles v. Whitley. Kiles specifically stated that the standard is not whether there would have been a different verdict, but whether the favorable evidence could, quote, reasonably be taken to put the whole case in such a different light as to undermine confidence  And I think that's the wrong standard. Kennedy. Well, what Mr. Braxton was testifying to was that Mr. Ogles was making sales to several other people besides Mr. Abuda, right? Correct. That's what Mr. Kramer testified to. No. Well, and as well, I agree with that, that Mr. Kramer also And Kramer wasn't impeached in any way. He wasn't cross-examined. So what difference does it make if the It wouldn't have cast the case in a completely different light if Braxton had been found to be a Federal toady. Well, I think it's enough that because the government specifically argued in the closing argument that he had no motive to lie, that he was an honest person, and indeed, as the brief in this case indicated, Mr. Braxton's testimony was a powerful rebuttal. I think that it does undermine confidence in the jury's verdict, given the fact that we didn't have that information with which to cross-examine Mr. Braxton. Maybe it wouldn't have changed the outcome, but I think it certainly, at a minimum, undermines confidence, which is the standard that the Court has to look to. But what do we do with the trial court's determination that it did not? Well, the trial court's determination was, as I understand it, was that disclosure wouldn't have made a difference in the jury verdict. And I don't think that's the correct legal standard. And this Court, of course, can review, has to review de novo the question of whether the lower court applied the correct legal standard. We got in trouble in United States v. Bagley when we did just what you're inviting us to do, and we got our wrists slapped for it. So I'm not quite so sure that I'm ready to go down that path again. Well, I think Kyles, which obviously came much after Bagley, has changed the dynamics a little bit in terms of what the court has to do, what the appellate court has to do. And I think that now you do have to review de novo the question of whether the trial court applied the correct legal standard to determine whether the court had used its discretion in denying the motion for a new trial. Was your argument that because Judge Jorgensen didn't use the magic words, undermines confidence in the reliability of the outcome, that her finding nonetheless is insufficient? I think that's right. If she didn't apply the correct standard, she couldn't have reached the right conclusion. But in using the words that she did, doesn't that essentially mean the same thing? I don't think it does, because I think Kyles, you pretty clearly rejected that kind of standard, saying that we don't look at whether there would have been a different verdict. We look at whether the verdict, whether confidence in the verdict could be undermined. Well, I'm assuming that you and the government briefed in connection with your motion for a new trial the appropriate standard for the court to apply. So assuming that the court had the relevant authority before it, and I guess to get back to the question I asked you before, does she have to use the magic language or is what she did sufficient on the assumption that she was properly briefed by competent counsel about the law? Well, I think she was properly – she was briefed, but I think she reached the wrong conclusion, because the government made the same argument before her, and she apparently adopted the government's interpretation or the government's view of what the law was, and we think that was – that legal view was an error. And the fact that she, in fact, didn't use the magic words is indicative of that, that she just simply applied the wrong standard. I see my time has run out. Thank you. All right. Thank you, Mr. Gardner. Mr. Rocker. Good morning again, Your Honors. Michael Rocker for the appellee at No. 04-10069. Your Honors, the government's position is that the evidence of willfulness was sufficient based on the testimony of Morse, and I call it Pouskalski. I apologize, but – and our position is we disagree respectfully with the defense reading of the Douglas decision. We don't believe that the advice that those two dealers gave to Mr. Ogles was in any way incorrect. There were two facets to it. Number one, as Judge Bee pointed out, you do have to use an Arizona licensee. That, as I think the defense counsel acknowledged, was at least accurate and consistent with Douglas. Now, the second question is whether it would have been permissible to give the gun directly to a dealer to either Morse or Pouskalski, let's say, at the show, and have them effectuate the transfer, or whether you need to return back to California and ship it to an Arizona licensee at that point. And that gets to the issue about footnote 3 of the Douglas opinion. If the Court accepts the premise from the prior argument that licenses are location-specific, it's clear that he couldn't have transferred the gun. He had to go back to his premises. And respectfully, to my opponent here this morning, that is exactly what the ATF inspector testified to. And her testimony appears on pages 19 to 21. And, by the way, it's also what the two dealers themselves testified to. But the ATF inspector specifically said, in response to a question, quote, what can a California licensee do if he wants to sell a firearm to a person at an Arizona gun show? Answer, he can display and take orders and then return to his licensed premises within the State of California, and at that point in time, transfer the firearm to an Arizona dealer who would then complete the transaction. So that is exactly what the ATF inspector testified to. And as we discussed in our brief as well, I don't have the specific page in front of me, but Morse and Puskowski both said something about, sure, we could serve as your transfer agent. All you have to do is give us a list of what they buy and then ship the guns to us in Arizona. That is accurate testimony. It's not incorrect, because licenses are location-specific. One other point that I just want to make. Let's just assume hypothetically that he could transfer it directly to a dealer at the gun show. He didn't do that here. He made no attempt to do that here. If he had tried to do that, then perhaps the issue would be squarely presented. But he didn't attempt to do that. He just bypassed it altogether and directly sold the gun to Mr. Buda. So I'm not even sure that this case necessarily even implicates it, because he made no attempt to comply with what he understood Douglas to stand for. In other words, there's three options, return to California. But your argument would have to be that he can't do that. That's right. But the point is, if he had tried to, it would squarely be, the issue would be joint. The issue would be joint. One other point, just to clarify the record. There is an exception where an out-of-State dealer, like a California dealer, can make a transfer directly at a gun show to another dealer. But that is only where a curio or a relic firearm is involved. And I believe that's also in a different sentence in 923J. So there is a limited exception for dealer-to-dealer transfers at an out-of-State gun show. But this was not a curio or a relic firearm. That exception doesn't apply. But I just wanted the record to be clear on that point. If the Court has no further questions, then I'll just turn to the Brady issue on the new trial point. It is our position that the evidence was not material. The district court got the standard correct. If you read Kiles, and I've read the decision and I've read Bagley many times, the Supreme Court has lots of different semantic ways of referring to materiality. I think the common denominator is that the ultimate focus is what is the probable impact that this new evidence would have had in light of the verdict. Can we say that this new evidence was so damaging, was so devastating, that we can no longer say that the verdict is reliable, that it was an accurate determination of guilt or innocence? Yes, the district court said that the evidence here would not have made a difference. It did not use the magic words undermine confidence in the verdict. The issue was briefed in the new trial motions, as Judge Tolman suggested. I don't think that there was an incorrect assessment. And I also think that, you know, even if hypothetically or assuming arguendo there was an erroneous assessment, the Court could look at the matter de novo. And I think it's clear, for the reasons largely pointed out by Judge B, that the evidence doesn't undermine confidence. You had Arthur Kramer, who testified to the same general issues as Mr. Braxton. In addition, Morrison-Puskowski testified on the element of willfulness. All this testimony was relevant to the claim of mistake-slash, you know, willful behavior. And so even if you want to say that this one witness would have been so impeached by the disclosure of this information, I still think that the integrity of the verdict remains intact because you had these independent sources. How do you think we apply the Bagley standard, then? If the legal issue is de novo, how do we treat the district court's factual determination that? Well, it depends. I guess if you view what the district court said, I think the district court, in fairness, I think the district court made a conclusion of law. I believe actually what I think it is is that the reasonable probability of a different effect on the verdict is, I believe, a mixed question of law and fact. I think the court's factual predicates, I think, would be entitled to deference. But the ultimate question of whether, given those factual predicates, this is material is for plenary review. And I think the Court could review that on its own motion. If the Court has no further questions, we are content to submit the rest of the matter on our briefs. Thank you, Your Honors. Thank you both for your argument in both cases. Thank you, Your Honor. Both will now be submitted, and we'll turn next to McBride. Thank you, Your Honor. May it please the Court. My name is Miranda Condra. Together with my father and co-counsel Gary Condra, we represent the appellants in this case. It appears from the briefing that the government has agreed that the issue regarding class certification was not waived before the district court. So unless the Court has specific questions regarding that issue, I'll just... You would help me greatly.
judges: Rymer, Tallman, Bea